IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF AHANA C.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF AHANA C., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

DYMOND C., APPELLANT.


Filed September 13, 2022.    No. A-22-146.


Appeal from the Separate Juvenile Court of Lancaster County: ELISE M.W. WHITE, Judge. Affirmed.

Stephanie Flynn, of Stephanie Flynn Law Office, P.C., L.L.O., for appellant.

John T. Schmidt, Deputy Lancaster County Attorney, for appellee.


PIRTLE, Chief Judge, and BISHOP and ARTERBURN, Judges.

BISHOP, Judge.

## INTRODUCTION

Dymond C. appeals from the decision of the separate juvenile court of Lancaster County terminating her parental rights to her daughter, Ahana C. We affirm.

## BACKGROUND

### PROCEDURAL BACKGROUND

Dymond is the biological mother of Ahana, born in 2012. Trenton O. is Ahana's biological father. The State sought to terminate Trenton's parental rights to Ahana in these same juvenile proceedings below, but he ultimately relinquished his parental rights to her, and he is not involved in this appeal.

- 1 -

On the evening of May 14, 2020, Dymond and Trenton were residing at a hotel in Lincoln, Nebraska, with Ahana when they were arrested for drug and other offenses. Ahana was taken into the emergency temporary custody of the Nebraska Department of Health and Human Services (DHHS) and placed with her maternal grandmother.

On May 18, 2020, the State filed a petition in the juvenile court alleging that Ahana was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). In count I of the petition, the State alleged that Ahana lacked proper parental care by reason of the fault or habits of Dymond, and/or that she was in a situation injurious to her health or morals in that:

1) On or about May 14, 2020, investigators with the Lincoln/Lancaster County Narcotics Task Force arrested Trenton . . . and **Dymond** . . . outside [a hotel], and executed a search warrant for rooms #102, #104, and #106, which were joined together and rented by Trenton . . . and/or **Dymond** . . . ;

2) [Ahana was] in the rooms, and there was food waste and dog feces throughout the rooms, with no clean area for [her] to sleep[;]

3) Investigators located marijuana, drug paraphernalia, a methamphetamine pipe with residue that pre-tested positive for amphetamines/methamphetamine, and a firearm in the rooms. All of these items were accessible to [Ahana];

4) The actions of **Dymond** . . . and/or the above situation places [Ahana] at risk of harm; and

5) All events occurred in Lancaster County, Nebraska.

(Emphasis in original.)

After a contested adjudication hearing on August 7, 2020, the juvenile court "[s]ustained" the allegations in the petition and adjudicated Ahana accordingly. Additionally, the court ordered Dymond to: "cooperate" with an "IDI" and substance abuse evaluation; not use or possess any mind or mood altering substances that were not prescribed by her treating physician; and comply with drug testing. Disposition was set for September 23, but was ultimately continued because Dymond timely appealed the adjudication. This court subsequently affirmed the adjudication of Ahana. See *In re Interest of Ahana C.*, No. A-20-641, 2021 WL 684250 (Neb. App. Feb. 23, 2021). The juvenile court entered judgment on this court's mandate on April 5, 2021. The disposition hearing was set for April 26.

Following a disposition hearing on April 26, 2021, the juvenile court entered its order on April 29. The court ordered Dymond to: not use or possess alcohol, controlled substances, or other mind or mood altering substances that were not prescribed by her treating physician; submit to random drug and alcohol testing; maintain a safe and stable living environment for herself and Ahana; maintain employment or other legal means of support for herself and Ahana; maintain regular contact with her case manager; cooperate with family support to assist her in complying with court ordered services and requirements of DHHS; and have supervised parenting time with Ahana.

Following a review and permanency planning hearing in June 2021, the juvenile court ordered Dymond to cooperate with outpatient therapy as recommended in her evaluation. The remainder of the court-ordered requirements were the same as they were in the April order.

Following a review and permanency planning hearing in September, the court-ordered requirements were the same as they were in the June order.

On September 29, 2021, the State filed a motion to terminate Dymond's parental rights to Ahana pursuant to Neb. Rev. Stat. § 43-292(6) and (7) (Reissue 2016). The motion alleged that active efforts to reunify the family had failed to correct the conditions leading to the adjudication of the child under § 43-247(3)(a), Ahana had been in an out-of-home placement for 15 or more months of the most recent 22 months, and termination of Dymond's parental rights was in the best interests of Ahana.

TERMINATION HEARING

A hearing on the motion to terminate Dymond's parental rights was held on January 5 and 25, 2022. The State called one witness to testify, and several exhibits were received into evidence. Dymond testified in her own behalf, and her mother also testified. A summary of the relevant evidence follows.

According to DHHS court reports and case plans received into evidence, on the evening of May 14, 2020, Dymond and Trenton were residing at a hotel in Lincoln with Ahana when they were arrested for drug and other offenses. Ahana was taken into the emergency temporary custody of DHHS and placed with her maternal grandmother. A sample of Ahana's hair was collected on May 26, and it tested positive for amphetamines, methamphetamines, and THC. As a result of the May 14 incident, Dymond was charged with "[p]ossess controlled substance," a Class 4 felony; "[c]ommit child abuse negligently/no injury," a Class 1 misdemeanor; and "[o]bstruct government operations," a Class 1 misdemeanor.

Megan Snodgrass, a child and family services specialist with DHHS, testified that Ahana was removed from Dymond in May 2020. Snodgrass has been this family's case manager since the beginning of March 2021. When Snodgrass was assigned to this case, she reviewed the case file. The appeal process for the adjudication was just finishing up, and the matter was set for disposition shortly thereafter.

Snodgrass stated that at the April 2021 disposition, Dymond was ordered to participate in supervised parenting time, a co-occurring evaluation, drug testing, and family support. When asked if Dymond had successfully participated in and completed any of the court-ordered services, Snodgrass stated that Dymond had been participating in ongoing supervised visits; she completed her evaluation, but did not participate in the aftercare recommendations; and she briefly participated in family support and accomplished the employment goal but did not accomplish any of the other goals and was unsuccessfully discharged.

Snodgrass testified that Dymond participated in supervised parenting time with Ahana twice per week for a total of about 8 hours per week; for a while it was three times per week, but Snodgrass said the documentation was not clear as to why it moved back to twice per week. Approximately half of the time that Dymond had visitation it was supervised by a family member. Parenting time occurred "pretty consistently." Based on the information reported to Snodgrass, no safety concerns were noted during visits, and Dymond appeared to have a loving relationship with Ahana.

Dymond testified that she had agency-supervised visits with Ahana on Wednesdays for 2 1/2 hours and Fridays for 3 hours, and then on another day her mother supervised her visits for

about 7 hours. Dymond described her visits as "[g]reat, sad when I leave, happy." Dymond "[a]lways" enjoyed visits with Ahana. Dymond said she lost visitation hours, and when asked if that was due to her work schedule, she said, "yeah, that and they, I guess, didn't have much [sic] workers."

Mickey C., Dymond's mother and Ahana's grandmother, testified that Ahana had been residing with her since "all this started." Mickey had been supervising some of the visits between Dymond and Ahana for "a few months now," and did not have any concerns during the visits. Mickey described the interactions between Dymond and Ahana as "very good," they are "very . . . connected" and have a good bond, and "Ahana just loves it when her mom comes and visits and they have a good time." On days that Ahana did not have visits with Dymond, she asked about her mother, was sad, and wanted to see her.

According to Snodgrass, Dymond completed the co-occurring evaluation in April 2021, and it recommended participation in outpatient therapy and the rehabilitative reunification plan. Outpatient therapy was subsequently ordered by the juvenile court. Snodgrass sent referrals for outpatient therapy and completed a letter of agreement to pay for the service, but Dymond did not participate in outpatient therapy. Although Snodgrass did not identify any barriers to Dymond's participation in therapy, Dymond communicated that she did not believe she needed therapy and then when she started working, Dymond identified work as a barrier. Snodgrass told Dymond to speak to the therapist (the same one that did her evaluation) to see if the therapist still believed Dymond needed or would benefit from therapy; Dymond corresponded with the therapist via email a couple of times, but the therapist never told Snodgrass that her recommendation changed.

When asked how Dymond's failure to participate in therapy impacted her opinion of Dymond's fitness as a parent, Snodgrass responded, "I think that if [Dymond] would have participated in therapy, we could have had more conversations"; Dymond was "still verbalizing that what was adjudicated didn't happen," her criminal case was still pending, and "it is concerning that she never took responsibility for why Ahana was removed from her care or when Ahana had tested positive for substances." Snodgrass stated, "[W]ithout any sort of recommendations from providers or updates from providers [it] makes it difficult to make any sort of recommendations regarding reunification or progress in this case."

On cross-examination, Snodgrass acknowledged that Dymond reached out to the therapist to schedule therapy, but had difficulty scheduling therapy; Dymond asked Snodgrass to follow up with the therapist. Snodgrass testified that when she spoke with the therapist, the therapist "indicated each time that [Dymond] would reach out it would be the week or couple days prior to court asking for a letter indicating that she didn't need individual therapy." The therapist was willing to get Dymond in for ongoing therapy, but was not willing to do just a one-time session because more time would be needed to see how she was doing. Additionally, because Dymond would wait until right before court to try to schedule an appointment, the therapist did not have the availability to get her in before court; then after court, Dymond would not respond to the therapist. Snodgrass spoke with the therapist the week of or the week before the termination hearing and learned that the therapist last heard from Dymond on October 26, 2021.

Dymond testified she tried to email the therapist in October 2021 and "we set it up and then I missed it 'cause . . . my manager at work didn't let me go, so I e-mailed her again and then she didn't reply for a while, and I told Megan about it, and she was supposed to get back to me

about [it] and never did." The last contact Dymond had with the therapist was an email she received in September. Dymond said she is willing to attend individual therapy.

Snodgrass testified that Dymond participated in about 15 of the 100 drug tests that were offered, and of the 15 tests she participated in, 3 tests were positive for amphetamines and methamphetamines; all three positive tests occurred in May 2021. According to Snodgrass, Dymond reported that the positive tests were the result of a medication she was taking (Sudafed). However, Snodgrass said the lab confirmed that was not true, and that the positive test was due to the ingestion of methamphetamines. Dymond's most recent participation in drug testing was on December 13. Snodgrass confirmed there were workarounds if Dymond's employment was a barrier to testing, e.g. Dymond did several off-site tests at her work or in the community. DHHS also offered to do drug testing through a sweat patch, but Dymond declined. Without consistent testing, Snodgrass did not know whether Dymond remained sober.

According to Dymond, she had been participating in drug testing. She checks "online" to see if her color is called. If she needs to test, someone will come to her to do the test if they have a spot available. The days she missed testing "are the days I work 'til, like 5:30, so by the time I checked, you know, I could do it, I called in," but "[n]obody was available to come out." She said, "[T]hey close at 5:00, so, and then I didn't make it in time for the call to – for them to come out in time," "[t]hey were full already." When asked if there was a certain time that she needed to call by in order to obtain the off-site testing, Dymond replied, "Not that I recall, no." Dymond denied using any controlled substances. She stated that the last time she completed a drug test was "[l]ast week"; she completed one or two tests in December 2021, and "a lot more" in November. When asked if she ever discussed using a sweat patch for drug testing with DHHS, Dymond said that "[y]es, they discussed it." And when asked if there was any reason she did not choose to use a sweat patch, Dymond responded, "No, I mean, I don't know."

As for family support, Snodgrass testified the goals were for Dymond to obtain housing and employment, and work on any additional goals identified that would be beneficial to her in the reunification plan; family support would also assist Dymond in setting up court-ordered services. Dymond was able to obtain employment beginning in June 2021. However, housing was an issue. Snodgrass stated that during the summer, Dymond informed her that she had obtained a trailer that she was redoing, but it was not livable; Dymond also reported living with friends and with Trenton's mother, and she did get on the housing waitlist. Ongoing therapy was never set up. Dymond was unsuccessfully discharged from family support in June.

Dymond testified that she has been employed since June 2021; she works Monday through Friday from 6 a.m. to 5 p.m., and two to three times per month she also works 1 day on the weekend. In July she purchased a trailer home, but "it's not ready yet." When she bought it, "the wood was up and not no walls or floor yet, but now I've made progress, a lot of progress, and the walls are up[,] got rooms done"; "All I have to do is lay the floor" and get the water heater installed. She was "hoping" to have the work done "within a month or two" and then she believed it would be an appropriate residence for Ahana. Dymond stated that she applied for housing with the Housing Authority in Lincoln and "went down there and met 'em . . . in person"; they were supposed to call her back, but never did so. Dymond said she called the Housing Authority three times and left a voicemail. When she looked for other places, "the rent was high" and "[e]very time I called someone, they were [sic] already had someone else['s], you know, application." The

trailer was "cheaper," and Dymond said, "I figured I'd get it done as fast as I could, but it's hard when I have hardly any help"; Dymond and her siblings have done most of the work.

Dymond testified that she was told by her family support worker that she no longer needed family support since she got a job. She said no one said anything to her about not complying with family support; she acknowledged being told that she was discharged from family support. Dymond did not believe family support would be helpful "[b]ecause I'm already doing, you know, a lot right now"; "I get up, I work, and then after work I go work on my trailer or I check if I have a UA and then I do my visits, so it'd just be too much," "[t]here's no reason for family support." When asked if she was in need of any assistance at this time, Dymond responded, "No."

Snodgrass testified that Ahana currently resided in the home of her maternal grandmother and had not been returned to Dymond since her removal in May 2020. Snodgrass did not believe that the issues that led to the removal had been corrected and said that Dymond had made "poor progress" towards correcting the reasons for adjudication. Snodgrass had not been able to recommend reunification between Ahana and Dymond, nor had she been able to recommend that visitation progress from supervised to a less structured level. Snodgrass stated that "[i]t is important for children, no matter what their age is, to achieve permanency in a timely manner," and she believed that Ahana was in need of permanency and it was in her best interests to achieve permanency as quickly as possible. Snodgrass did not believe that permanency could be achieved with Dymond in the near future.

When asked why she believed the juvenile court should not grant the State's motion to terminate her parental rights, Dymond responded,

> Because I've been, you know, doing the best I can, you know, and can get, you know, help do what I need to do and it's hard when I don't have help. But then I got help, you know, I guess this case helped me get a job, which I'm grateful for, and I [sic] just been busy working and trying to get my trailer done as fast as I can by myself, so.

If the court granted the State's motion to terminate her parental rights, Dymond asked that she still be allowed to have contact with Ahana, and she believed that would be in the child's best interests. Mickey also believed that it would be in Ahana's best interests to continue to have visits with Dymond if the juvenile court terminated Dymond's parental rights; Mickey said "it would just break Ahana's heart if she didn't have more visits with her mom."

JUVENILE COURT'S DECISION

In an order entered on February 2, 2022, the juvenile court found by clear and convincing evidence that statutory grounds for termination of Dymond's parental rights existed pursuant to § 43-292(6) and (7). The court also found that the State met its burden of rebutting the presumption that Dymond was a fit parent. And the court found that termination of Dymond's parental rights was in the child's best interests and terminated Dymond's parental rights to Ahana.

In an order entered on February 4, 2022, the juvenile court sustained Dymond's previously filed motion for continued visitation pending appeal. The court found that it was in Ahana's best interests to "maintain some limited contact" with Dymond and ordered "fully supervised"

visitation to occur "no more than once per month, for no more than four hours per visit"; the court's order did not specify that the visitation was limited to the pendency of the appeal.

Dymond appeals.

## ASSIGNMENTS OF ERROR

Dymond assigns, restated, that the juvenile court erred in finding that (1) statutory grounds existed to terminate her parental rights, and (2) termination of her parental rights was in Ahana's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## ANALYSIS

### STATUTORY GROUNDS FOR TERMINATION

The State sought to terminate Dymond's parental rights under § 43-292(6) and (7). The juvenile court found that both grounds existed by clear and convincing evidence.

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." In her brief, Dymond acknowledged that the State was able to show that Ahana was placed outside of the parental home for 15 of the most recent 22 months, but she argued that the time that the adjudication appeal was pending should have tolled the clock. However, by the plain and ordinary meaning of the language in § 43-292(7), there are no exceptions to the condition of 15 out of 22 months' out-of-home placement. *In re Interest of Mateo L. et al., supra*. Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al., supra*. In other words, if the 15-out-of-22 months period is met, § 43-292(7) is met. See *In re Interest of Mateo L. et al., supra*. In this case, Ahana was removed from Dymond's care in May 2020. She remained out of home through at least January 2022, when the termination hearing was held; this satisfies the 15-out-of-22 months period.

The State has shown clearly and convincingly that § 43-292(7) exists as a statutory basis for terminating the parental rights of Dymond. And since any one of the bases for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning the other statutory basis for termination. *In re Interest of Mateo L. et al., supra*.

Furthermore, we note that because we do not consider whether termination of parental rights was proper pursuant to § 43-292(6), Neb. Rev. Stat. § 43-283.01 (Cum. Supp. 2020), which requires reasonable efforts to reunify families, it is not applicable to the instant case. Section 43-283.01 is only incorporated into § 43-292(6), not into the remaining subsections of § 43-292. See *In re Interest of Andrew M. et al.*, 11 Neb. App. 80, 643 N.W.2d 401 (2002). See, also, *In re*

*Interest of Mateo L. et al., supra* (reasonable efforts to reunify family required under juvenile code only when termination is sought under § 43-292(6)). We next consider whether termination is in Ahana's best interests.

BEST INTEREST AND UNFITNESS

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra.* The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

Notably, Dymond did not make meaningful efforts to participate in outpatient therapy. She did not consistently comply with drug testing, and after identifying her employment as a barrier to testing she did not utilize sweat patch testing. She was discharged from family support and did not believe that such support would be helpful. Additionally, she did not have safe and stable housing.

The juvenile court found that "[w]hile [Dymond] has consistently engaged in parenting time with Ahana, she did not cooperate with virtually any of the other services ordered by the Court or recommended by the Department." She did not participate in therapy to address the adjudicated issues, and instead, contacted the therapist sporadically to try to get the therapist to change her recommendation for treatment. Dymond did not consistently comply with drug testing to demonstrate her sobriety, completing only 15 out of the 100 tests offered to her. While she was able to obtain employment, she had not been able to secure safe and stable housing for her daughter throughout the life of the case and testified that the home she has secured was still without running water or flooring at the time of trial. We agree with the juvenile court's assessment of the evidence.

Ahana, now 10 years old, had been out of Dymond's care for 20 months at the time the termination hearing concluded. Snodgrass believed that Ahana needed permanency, and it was in her best interests to achieve permanency as quickly as possible. Snodgrass did not believe that permanency could be achieved with Dymond in the near future. We agree that Ahana deserves permanency. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). And where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J., supra.* The State proved that Dymond was unfit, meaning that she has a personal deficiency or incapacity which has prevented, or will prevent, performance of a

reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to the child's well-being. See *In re Interest of Leyton C. & Landyn C., supra*. We further find that there is clear and convincing evidence that it is in Ahana's best interests to terminate Dymond's parental rights.

## CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Dymond's parental rights to Ahana.

AFFIRMED.